# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

Assigned on Briefs December 7, 2010

## ANTONIO ARNOLD v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07507      Carolyn Wade Blackett, Judge**

---

**No. W2010-00268-CCA-R3-PC  - Filed March 31, 2011**

---

The petitioner, Antonio Arnold, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief. The petitioner was convicted by a Shelby County jury of felony murder, voluntary manslaughter, aggravated burglary, and aggravated assault. He was subsequently sentenced to an effective term of life in prison. On appeal, he contends that the denial of his petition was error because he received ineffective assistance of counsel at trial. Following review of the record before us, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Andrew Hutchinson, Paul K. Guibao, and Matthew S. Lyons, Memphis, Tennessee, for the appellant, Antonio Arnold.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tracey Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Procedural History

The relevant facts underlying the petitioner's multiple convictions, as recited on direct appeal, are as follows:

> The charges arose out of the [petitioner's] entry into Sandra Alexander's home in the morning hours of October 21, 2001, and his

assaulting Ms. Alexander and shooting her boyfriend, Gary Colbert.

. . . .

At trial, Diana Sample, Ms. Alexander's mother, testified that she talked with the [petitioner] about two weeks before the offenses giving rise to this case. Ms. Sample recalled that the [petitioner] showed up at her house and used her phone to call Ms. Alexander. According to Ms. Sample, the [petitioner] told Ms. Alexander, "I'm going to kill your B.A. on your birthday. . . . I want your momma to know," and then left. Ms. Sample testified that she called Ms. Alexander back and told her "we need to go downtown and put a peace bond on him because he might hurt [you]." On redirect examination, Ms. Sample testified that after the break-in and shooting, Ms. Alexander was withdrawn, had a nervous breakdown, and tried to commit suicide.

Ms. Alexander testified that she used to date the [petitioner] and they had a child together. She recalled that around [six] a.m. on October 21, 2001, she got up to go to the bathroom when she noticed her bedroom door was unlocked. As she opened the door, the [petitioner] burst into her room, pushed her in the face, and said he was going to kill her. Ms. Alexander remembered that the [petitioner] was wearing a utility belt containing an axe, gun, and handcuffs when he entered the room. The [petitioner] ordered her to put handcuffs on Colbert but she was not able to latch them. As she pled with the [petitioner] not to hurt Colbert, Colbert got up off the bed and he and the [petitioner] began tussling with the gun and the gun went off. Ms. Alexander testified that she ran for help after the gun went off.

On cross-examination, Ms. Alexander testified that Colbert normally carried a silver-gray gun with a broken handle, but she did not see him with a gun the morning of the incident. Ms. Alexander reiterated that the last thing she saw as she ran out of her bedroom was Colbert and the [petitioner] tussling with a black gun that the [petitioner] had pulled out.

Cassandra Cooper, Ms. Alexander's oldest child, testified that she was sleeping in her bedroom on October 21, 2001, when she was awakened by "[a] lot of noise and commotion, [and] arguing." She recalled that she heard her mother's, Colbert's, and the [petitioner's] voices, so she called 911 "[b]ecause [the petitioner] wasn't supposed to be in the house." Cassandra testified that she ran outside and hid in the bushes. A short while later, Cassandra saw Ms. Alexander run out of the house and down the street. Cassandra testified that

-2-

the [petitioner] ran out of the house to his car that was parked next door, then went to the side of the house and shot at a window. Cassandra explained that she did not see the [petitioner] take the shot, but she heard glass break. Cassandra testified that when the [petitioner] came out of the house he was holding something to his side that she thought was a gun.

Tiara Cooper, Ms. Alexander's second-oldest child, testified that she awoke to the sound of gunshots on October 21, 2001. Tiara testified that she got out of bed in time to see the [petitioner] exit the house. She remembered seeing a lot of blood and Colbert on the kitchen floor breathing heavily.

. . . .

Memphis Police Officer Russell Woolley testified that he received a disturbance call on October 21, 2001, from Ms. Alexander's residence. Officer Woolley testified that as he approached the residence, a young girl jumped out from behind some bushes and said, "don't go inside. Don't go inside. He's in there. He'll kill you." Officer Woolley recalled that upon entering the house he saw a black ski mask on the floor and he smelled fresh gunpowder, indicating that a weapon had recently been discharged. During his canvas of the house, Officer Woolley saw a barely-alive naked male lying face down on the kitchen floor with a gun in his hand. Office Woolley testified that his partner recovered the gun for safety reasons and placed it on top of the china cabinet.

. . . Officer Woolley testified that Colbert died while he was on the scene. Outside, Officer Woolley noticed a white car parked in front of the house next door.

. . . .

Lieutenant Anthony Craig of the Memphis Police Department testified that he was one of the homicide officers assigned to investigate the case. Lieutenant Craig recalled that it appeared that the suspect gained entry into the home through an open window or had pried open a window. Thereafter, the suspect entered a bedroom, a struggle ensued, and shots were fired. Lieutenant Craig testified that Ms. Alexander identified Colbert as the victim and the [petitioner] as the possible suspect. Lieutenant Craig further testified that the [petitioner's] father showed up at the scene and indicated that the [petitioner] had written some type of a list with Ms. Alexander's name on it.

Lieutenant Craig recalled that the [petitioner's] abandoned vehicle was towed to the storage lot where its contents were inventoried. In the vehicle, Lieutenant Craig found a green and black duffle bag, "one stick, one cassette tape, duck tape, garbage bag, plastic, ski mask, flexie cuffs, nine millimeter ammunition, gray notebook, pagers, box cutters, screwdriver, and blue bandana." Lieutenant Craig testified that he listened to the cassette tape and it contained two songs, then a male voice that said he was Captain Smith and he was on a mission. The speaker on the tape also referred to himself as a convicted felon. Lieutenant Craig was able to identify the [petitioner] as the speaker. According to Lieutenant Craig, he did not formally interview the [petitioner], but the [petitioner] spontaneously claimed that he was Captain Smith with the Marine Corps and he was "coming back from a highly volatile mission, and . . . he had encountered the enemy in which he had employed the rules of engagement. . . . That at the time he took the enemy out. It was a female involved with the enemy at which time he . . . could not . . . eliminate her." Lieutenant Craig stated that he believed the [petitioner] was "faking it."

. . . .

Tamala Arnold, the [petitioner's] sister, testified that the [petitioner] lived with her in October of 2001. Ms. Arnold recalled seeing the [petitioner] with papers showing that he had taken out a loan to pay off Ms. Alexander's loan on her house. On cross-examination, Ms. Arnold admitted that she knew about Ms. Alexander's order of protection against her brother, yet she knew they had seen each other on occasion. Ms. Arnold also admitted that the [petitioner] was a convicted felon.

Adrian Arnold, the [petitioner's] brother, testified that he was at Ms. Alexander's house along with his father shortly after the shooting. . . . Mr. Arnold further recalled that he saw the [petitioner] the following day and he was acting "[v]ery out of the ordinary," like "he was in a military training doing some kind of business."

*State v. Antonio Arnold*, No. W2005-00119-CCA-R3-CD (Tenn. Crim. App., at Jackson, Aug. 25, 2006).

Based upon this conduct, the petitioner was indicted by a Shelby County grand jury for first degree premeditated murder, felony murder, aggravated burglary, and aggravated assault. Following a jury trial, the petitioner was convicted of voluntary manslaughter, felony murder, aggravated burglary, and aggravated assault. He was subsequently sentenced

by the trial court to an effective term of life in prison. The petitioner filed a direct appeal to this court, and his convictions were affirmed.

Thereafter, the petitioner filed a timely petition for post-conviction relief, alleging that he was denied the effective assistance of counsel. The post-conviction court initially dismissed the petition because it lacked any statements indicating the grounds upon which relief was sought or any factual basis as required by statute. The petitioner appealed, and a panel of this court reversed the summary dismissal and remanded the case for an evidentiary hearing. *Antonio Arnold v. State*, No. W2007-02640-CCA-R3-PC (Tenn. Crim. App., at Jackson, May 5, 2009). Thereafter, post-conviction counsel was appointed, and an amended petition for relief was filed. An evidentiary hearing was conducted thereafter, at which the following grounds for relief were presented: (1) whether trial counsel failed to elect a defense strategy, namely diminished capacity; (2) whether trial counsel failed to present expert testimony regarding *mens rea*; (3) whether trial counsel failed to present witness testimony, specifically from the petitioner's father, that could have refuted the underlying felony and, therefore, removed liability for felony murder; (4) whether trial counsel failed to attack the credibility of Ms. Alexander by introducing evidence of a prior nervous breakdown; (5) whether trial counsel failed to introduce the protective order into evidence for the purpose of demonstrating that the petitioner was not barred from entering the home; and (6) whether trial counsel failed to introduce evidence showing that the petitioner had an ownership interest in the house he was charged with burglarizing based upon his securing a loan.

The first witness called was the petitioner. He testified that, during pretrial preparations, he and trial counsel had repeatedly discussed the defense of diminished capacity. Furthermore, the petitioner stated that he was sent to Midtown Mental Health Institute for evaluation and, subsequently, was interviewed by a second doctor. However, he noted that no mental health expert was called to testify at his trial and that the jury was given no instruction regarding diminished capacity. The petitioner stated that, had a diminished capacity defense been presented, he believed the *mens rea* elements of the offenses could have been negated.

The petitioner also testified that he repeatedly informed his attorney that he had legal access to Ms. Alexander's house and that he felt this fact should have been established at trial to negate the offense underlying the felony murder charge. He stated that he had secured a loan on the house to keep Ms. Alexander from losing it. However, he was unable to recall which financial institution he had used. The petitioner testified that he had informed trial counsel of the loan but opined that no documentation regarding the loan was presented at trial. He testified that, to his knowledge, trial counsel had made no attempt to locate the loan documentation. The petitioner also faulted trial counsel for failing to introduce a copy of

the protective order, which did not include specific language barring him from Ms. Alexander's home.

The petitioner's final complaint was that the State presented evidence at trial which showed that he had entered Ms. Alexander's home through a window, evidence he claims should and could have been negated. The petitioner testified that he informed trial counsel that he did not enter the home through a window but, rather, entered through an unlocked door. The petitioner testified that trial counsel should have put on evidence to establish this, specifically, the fact that the window was painted shut, thereby precluding the petitioner from being able to access the house through the window. He complained that trial counsel failed to call his father who had direct knowledge of the window, as he had personally painted the home shortly before the incident.

Trial counsel was the next witness to testify. He stated that he provided discovery to the petitioner, reviewed the materials, and met with the petitioner on multiple occasions. Trial counsel stated that his initial strategy was to pursue a defense of diminished capacity based upon the petitioner's erratic behavior at the time of the offenses. To further this defense, trial counsel had the petitioner evaluated at Midtown Mental Health Institute. The test results did not support a finding of insanity or incompetence. However, the testing did reveal that the petitioner suffered from "mild abuse cerebral atrophy," or shrinking of the brain. Based upon this finding, trial counsel then employed a forensic neuro-psychologist to determine if that condition could support a diminished capacity defense. After interviewing the petitioner, the expert found no evidence of mental disease or defect. As such, trial counsel stated that he was not able to pursue his initial strategy and had to pursue a defense of reasonable doubt. Trial counsel testified that he informed the petitioner of the findings.

Trial counsel acknowledged that the petitioner informed him that he had secured a loan to help Ms. Alexander keep her house and that, based upon this ownership interest, he felt he had the right to be there despite the restraining order in place. However, the petitioner had no documentation to support this, and trial counsel, after searching county records, was also unable to locate any supporting documentation. He noted that the information was put before the jury by the petitioner's sister, who testified at trial that this second mortgage existed. Trial counsel further testified with regard to his intent to introduce the actual protective order into evidence because the verbiage of it did not specifically prohibit the petitioner from being in the home. However, trial counsel testified that he did not seek to introduce the evidence after all because the State was prepared to call the commissioner who had issued the protective order to testify that the petitioner had been verbally instructed to stay away.

Trial counsel also testified regarding the petitioner's complaint that he did not present evidence to rebut the State's theory of how the petitioner had gained entrance into the home. Trial counsel testified that he had spoken with the petitioner's father and anticipated calling him as a witness to testify that he had done work on the home and that the window in question was painted shut. However, the petitioner's father was taken into custody during the trial and was not present. Moreover, trial counsel testified that after the State presented its case, he did not believe that they had actually offered a firm explanation as to how the petitioner had entered the home, so it really was not an issue which needed contradiction.

The petitioner also called both his mother and father to testify. The petitioner's father, David Arnold, testified that he had painted Ms. Alexander's home and was personally aware that the windows were painted shut. He acknowledged that he was arrested on the fourth day of trial and held in the jail. Mr. Arnold was not aware of any efforts made by trial counsel following his arrest to locate him for the purpose of testifying. The petitioner's mother testified and stated that she had personally informed trial counsel that Mr. Arnold had been arrested and where he was located at the time of trial.

After hearing the evidence presented, the post-conviction court found that the petitioner had failed to establish his entitlement to relief. The petitioner now timely appeals that decision.

**Analysis**

On appeal, the petitioner contends that the post-conviction court erred in denying his petition for relief because "trial counsel's representation fell outside the standards set forth in *Baxter v. Rose* and *Strickland v. Washington*." To succeed on a challenge of ineffective assistance of counsel, the petitioner bears the burden of establishing by clear and convincing evidence the allegations set forth in his petition. T.C.A. § 40-30-110(f) (2006). The petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the petitioner must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). An appellate court will not reweigh or reevaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial

judge, not the appellate courts. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997).

It is not necessary for a court to address deficiency and prejudice in any particular order or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland*, 466 U.S. at 694).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id*. at 461. "[A] trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley*, 960 S.W.2d at 578). However, conclusions of law are reviewed under a purely *de novo* standard with no presumption that the post-conviction court's findings are correct. *Id*.

Initially, we must note that we are somewhat unclear as to the exact argument being raised by the petitioner. It is clear that he is asserting ineffective assistance of counsel but what remains unclear is his actual contention of how trial counsel was deficient. Other than a recitation of the applicable law, the petitioner's brief contains the following:

The above standards used in *Baxter* seem to hinge on the involvement of a defendant in his or her defense. This is because the right to trial exists for the defendant and not trial counsel. To ignore, to not even further explore information from your client, is preventing that defendant from participating in their own defense. In this matter especially, where a killing was admitted and the focus was as to mental state as to what type of killing or supporting the underlying felony used to justify as charge of felony murder, the defendant must be involved in his or her own defense. [The petitioner] submits that in his matter, such deficiencies existed that it rendered counsel ineffective under the first prong under *Strickland* and under *Baxter*.

The petitioner continues that the deficiencies were prejudicial because the "failures prevented [the petitioner] from presenting existing evidence that would have almost certainly have negated the [S]tate's case against him." Again, we are unclear as to the petitioner's exact allegations on appeal. The argument that he was not allowed "to participate in his own defense" was not raised in either the petition for post-conviction relief or before the court at

the hearing. As such, the petitioner has waived this issue, and we are precluded from review as issues may not be raised for the first time on appeal. *See* T.C.A. § 40-30-106(g); *see also Fayne v. Vincent*, 301 S.W.3d 162, 171 (Tenn. 2009).

The State notes that the petitioner "appears" to contend that counsel was ineffective for six reasons, those specifically argued at the hearing: (1) failure to pursue a diminished capacity defense; (2) failure to present expert testimony regarding *mens rea*; (3) failure to present testimony to refute the underlying felony; (4) failure to attach the credibility of the female victim: (5) failure to present evidence to show that the petitioner was not prohibited from accessing the house; and (6) failure to show the petitioner's ownership interest in the house. As these issues were addressed by the post-conviction court, in the interest of justice and finality, we will briefly review the court's determinations.

In its order denying relief, the post-conviction court reviewed the evidence presented with regard to each of the petitioner's arguments and concluded that the petitioner had failed to establish that he was denied the effective assistance of counsel. Following review, we conclude that nothing in the record before us preponderates against the post-conviction court's findings.

## I.     Diminished Capacity Defense/Expert Testimony

The petitioner continues to maintain that trial counsel was deficient for failing to pursue this defense and to call experts to the stand to support it. However, his assertion is belied by the testimony of trial counsel at the hearing. Counsel specifically testified that he considered and attempted to pursue a defense of diminished capacity. He retained experts to examine the petitioner, and the conclusion reached following the examinations was that the petitioner did not suffer from a mental disease or defect. This finding, alone, precluded use of the defense. Trial counsel cannot be faulted for failing to present and prepare a defense which was clearly not supported by the facts before him. Moreover, the petitioner's complaint that trial counsel failed to present expert testimony at trial is misplaced. Had trial counsel called an expert to the stand to testify, the expert would have assumedly testified that the petitioner did not suffer from a mental disease or defect, testimony which would have placed before the jury direct evidence that the defense was not viable. Finally, we note that the petitioner has failed to present any evidence to contradict the findings testified to by trial counsel, thereby precluding relief pursuant to *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

## II.    Testimony to Refute the Underlying Felony, to Establish the Petitioner's Ownership Interest in the Home, and to Establish that he was not Prohibited from Entering the Home

To support the petitioner's contention that he had entered the home through an unlocked door, the petitioner testified at the post-conviction hearing that counsel was deficient for failing to present testimony from his father that the window had been painted shut. He further complained that trial counsel failed to locate and introduce loan documentation which established that the petitioner had taken out a second mortgage on the home in order to prevent Ms. Alexander from losing the home. Finally, he complained that trial counsel failed to introduce the actual restraining order entered against the petitioner, as it did not contain specific language prohibiting the petitioner from entering the home. Again, trial counsel gave testimony with regard to each of these alleged deficiencies, and the post-conviction court accredited that testimony. As has been noted on numerous occasions, it is not the function of this court to reweigh or reevaluate credibility determinations made in the lower court. *See Henley*, 960 S.W.2d at 578-79.

With regard to calling the petitioner's father, trial counsel testified that he anticipated calling him to testify that the windows of Ms. Alexander's house had been personally painted shut by him. Trial counsel intended to offer this testimony to counter the State's assertion that the petitioner had gained access to the home through the window. However, during the course of the trial, Mr. Arnold was taken into custody on outstanding charges and taken to jail. Although there was conflicting testimony as to whether trial counsel was aware of Mr. Arnold's whereabouts, that is not a determining factor in our review. Trial counsel testified that the State did not rely on the manner in which the petitioner had gained entrance to establish the elements of their case. The victim began her account of the events by stating that she first saw the petitioner in the bedroom. While the detective did testify that it was their theory that the petitioner had entered the home through an open window or pried a window open, this is not sufficient to find deficient performance for trial counsel's failure to rebut the statement. The statement indicates that the petitioner might have pried the window open, which is not in conflict with the fact that the window was painted shut. The State relied upon the fact that the petitioner had entered the home, where he had no right to be, in some illegal manner and had committed the crimes inside the home. Calling the petitioner's father to testify that he had painted the windows shut would not have negated any of the State's evidence.

Trial counsel also testified in contradiction to the petitioner and stated that he had specifically tried to find documentation to support the petitioner's contention that he had secured a second mortgage on the home, thereby establishing a partial ownership interest in the home. Trial counsel testified that he personally went to the court house and checked the records but was unable to find any evidence of the loan. Nonetheless, trial counsel did attempt to elicit the information through the petitioner's sister, who testified at trial that the petitioner had taken out a loan. The jury's decision to discredit that testimony or give it little weight does not equate to deficient performance on the part of trial counsel. Additionally, as

noted previously, the petitioner failed to put forth any evidence at the hearing which would lend credence to the fact that the documents exist. As such, he fails to establish his burden. *See Black*, 794 S.W.2d at 757.

With regard to the order of protection issued against the petitioner, trial counsel testified that he considered seeking to admit the document into evidence as it did not explicitly state that the petitioner was barred from Ms. Alexander's home. However, during the trial, it became apparent that the State intended to call the commissioner who issued the order. Trial counsel had a discussion with her and, based upon that conversation, made the decision not to introduce the evidence, as the commissioner would have testified that she personally informed the petitioner to stay away. This was clearly a reasoned strategic choice made by trial counsel, and this court does not reexamine such choices. *See Hellard*, 629 S.W.2d at 9.

## III. Failure to Attack the Credibility of the Victim

At the hearing, the petitioner opined that trial counsel was deficient in that, in order to better impeach Ms. Alexander's testimony, he failed to introduce evidence of a prior mental breakdown suffered by Ms. Alexander. We are somewhat unclear as to the petitioner's actual contention with regard to this on appeal. Trial counsel testified that he chose to object to testimony given by the Ms. Alexander's mother regarding a breakdown that she has suffered after this incident. The petitioner failed to put forth evidence which would bring into question trial counsel's decision not to cross-examine the witness about the prior breakdown or, if he had done so, what effect it would have had on the outcome of the trial. As previously noted, it is not the function of this court to second-guess trial tactics.

As noted above, we can reach no other conclusion in this case other than that the post-conviction court properly determined that the petitioner failed to show by clear and convincing evidence that he received ineffective assistance of counsel. He is entitled to no relief.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE